733 A.2d 433

LAURA E. AIELLO, PLAINTIFF–APPELLANT, v. MUHLENBERG REGIONAL MEDICAL CENTER, D/B/A MUHLENBERG HOSPITAL, MABINI PIEZAS, M.D., P.A., JOHN DOE(S) (SAID NAME(S) BEING FICTITIOUS AND UNKNOWN), JANE DOE(S) (SAID NAME(S) BEING FICTITIOUS AND UNKNOWN) AND ROE DOE(S) (SAID NAME(S) BEING FICTITIOUS AND UN-KNOWN), DEFENDANTS, AND MAHESH SHAH, M.D., DEFEN-DANT–RESPONDENT.

Argued March 16, 1999—Decided June 29, 1999.

*Robert D. Farber* argued the cause for appellant.

*Stephen J. Tafaro* argued the cause for respondent (*Tafaro & Flynn,* attorneys; *Frederick J. Hughes, Jr,,* on the brief).

The opinion of the Court was delivered by

HANDLER, J.

This is a medical malpractice case that requires the Court to address the principle of law that allows a doctor to avoid liability for injuries to a patient resulting from medical conduct involving the "exercise of judgment." The alleged malpractice in this case arose out of the performance of a medical procedure known as a laparoscopic tubal ligation. The procedure requires the insertion of a needle into the patient's body. The plaintiff sustained significant internal injuries when the defendant, her surgeon, mistakenly inserted the needle through her abdomen and beyond the operative field.

The issue is whether, under these circumstances, the court should have instructed the jury to consider whether the doctor's

conduct in performing the medical procedure involved the reasonable "exercise of judgment" that could be a defense or excuse for medical "mistake;" or alternatively, whether the performance of the medical procedure raised only the question of the doctor's negligence or lack of reasonable professional care, which would not provide a defense based on a "mistake" otherwise attributable to the "exercise of judgment."

I

On September 30, 1992, defendant, Dr. Mahesh Shah, a specialist in obstetrics and gynecology, performed a laparoscopic tubal ligation on plaintiff, Laura Aiello, at Muhlenberg Regional Medical Center. During the procedure, a Verres needle inserted by defendant perforated plaintiff's mesocolon and mesenteric arteries and lacerated her left iliac vein.

Plaintiff commenced a medical malpractice action against Dr. Shah, another surgeon, Dr. Mabini Piezas, and Muhlenberg Regional Medical Center d/b/a Muhlenberg Hospital. Plaintiff claimed that following the surgery she suffered from chronic abdominal and pelvic pain, tingling and numbness in her left groin, and pain during intercourse.

The case was presented to a jury with an instruction that it should consider whether defendant had exercised reasonable medical judgment. The jury found that defendant had not deviated from accepted standards of medical care in treating plaintiff, and returned a no cause of action verdict in favor of defendant. Plaintiff moved for judgment notwithstanding the verdict and/or a new trial on the issue of liability pursuant to *Rule* 4:40–2.

The trial court thereafter granted plaintiff's motion for a new trial on the issue of damages. The court determined that, as a matter of law, the injury to plaintiff's iliac vein could not occur in the absence of negligence. The court also ruled that the jury instruction was erroneous because it included the standard of a physician's reasonable "exercise of judgment" as a possible basis for not finding defendant liable.

Defendant filed a motion for leave to appeal, which was denied by the Appellate Division. This Court subsequently granted defendant's motion for leave to appeal and summarily remanded to the Appellate Division to consider the merits.

In an unpublished *per curiam* opinion, the Appellate Division reversed the trial court's entry of a directed verdict in favor of plaintiff, and remanded for the entry of a no cause of action verdict. The court reasoned that "reasonable minds could differ on whether or not Dr. Shah was negligent" and that the trial judge correctly included the legal standard of a physician's "exercise of judgment" in the jury charge. Judge Shebell dissented in part, agreeing that the directed verdict should be vacated, but concluding that the trial court committed reversible error by including the "exercise of judgment" portion in the jury charge.

Plaintiff appeals to this Court as of right pursuant to *Rule* 2:2–1(a)(2).

## II

This case requires an understanding of the medical procedures that were performed on plaintiff. Plaintiff first consulted Dr. Shah about replacing her I.U.D., which she used for birth control. Dr. Shah recommended sterilization as an alternative after plaintiff informed him that she was certain that she did not want to have any more children. Because plaintiff was very concerned about any scarring that could result from surgery, defendant determined that it was necessary to perform a laparoscopic tubal ligation.

A tubal ligation is a surgical procedure that is undertaken to occlude a woman's fallopian tubes, making her sterile. When performed using a laparoscope, a telescopic device that allows visual examination of the internal cavity, the procedure may be performed without significant incisions to a patient's skin, thereby avoiding scarring.

In order to perform a laparoscopic tubal ligation, a surgeon makes a small incision either in or directly below the navel and introduces a Verres needle into the abdominal cavity. The Verres needle is an instrument that has a ten-centimeters-long outer needle with a blunt protruding probe at its tip. Once the probe meets with resistance, it retracts, and a spring mechanism propels the needle forward. During a laparoscopic tubal ligation, the Verres needle is pushed through the patient's inner lining and into the peritoneal cavity, which contains the intestines, uterus, ovaries and stomach. When the needle is at that position, the abdominal cavity is insufflated with carbon dioxide gas, which pushes the intestines down and away from the area, allowing for greater instrument mobility and visualization. The Verres needle is then removed and a laparoscope is introduced into the abdomen. Next, a cutting instrument is pushed into the lower abdomen through a second incision in the upper pelvic area. Sterilization is completed by a procedure that requires placing plastic bands, called fallope rings, on the left and right fallopian tubes. This was the surgical procedure that was performed on plaintiff.

After plaintiff's tubal ligation was completed, Dr. Shah noticed that some blood had collected in plaintiff's cul-de-sac, an extension of the peritoneal cavity, which lies between the rectum and the posterior wall of the uterus. A laparotomy, that is, a surgical opening of the abdomen, was required to correct this condition. Dr. Shah performed a laparotomy assisted by Dr. Mabini Piezas.

During the laparotomy procedure, Dr. Piezas noticed a small injury to plaintiff's mesocolon and also saw that plaintiff's superior mesentery artery was lacerated and "bleeding profusely." Dr. Piezas further noticed a hematoma, a mass of blood slightly larger than a cotton ball, on plaintiff's left iliac vein. The iliac vein is a major blood vessel found outside of the abdominal cavity, below the intestinal area and on top of the spine. Its location is outside of the operative field for a tubal ligation. Dr. Piezas sutured the superior mesenteric artery and the iliac vein to stop the bleeding.

At trial, Dr. Jeffrey L. Soffer, a board certified specialist in obstetrics and gynecology, testified as an expert witness on plaintiff's behalf. Dr. Soffer expressed the opinion that Dr. Shah deviated from the acceptable standard of care, because the Verres needle was thrust into the abdomen at a depth far beyond the operative area. According to Dr. Soffer, the Verres needle should never have been inserted beyond the abdominal cavity, and it could not have been so inserted in the absence of negligence.

Dr. Soffer testified that the pressure applied to the Verres needle to push it through the patient's inner lining is manually regulated and controlled by the physician. Dr. Soffer explained that when a Verres needle is first inserted into the abdominal cavity, the doctor should make a very shallow penetration to avoid the risk of injury because there is no carbon dioxide gas to protect the intestinal organs. On a thinner person, such as plaintiff, less pressure is needed. If the physician thrusts the Verres needle in too far, it may pierce the colon and surrounding vessels, and "do major damage to the major veins." According to Dr. Soffer, the Verres needle should not be inserted more than two centimeters once the doctor pierces the abdominal lining. Dr. Soffer posited that the Verres needle had to have been advanced ten centimeters, about the entire length of the needle, to come into contact with plaintiff's iliac vein.

Defendant's expert, Dr. Karl G. Klinges, an obstetrician and gynecologist, testified that the Verres needle could have nicked the iliac vein even in the absence of negligence, and that there was no evidence that Dr. Shah failed to conform to the standard of care. Dr. Klinges further stated that the insertion of the Verres needle is a "blind procedure," which required Dr. Shah to exercise judgment in determining the proper angle and depth of insertion based upon plaintiff's anatomy. According to Dr. Klinges:

> You know to the best of your ability—you know anatomy but you have a confined space you're trying to slip this needle into. There are normal variations. And even when you're sure you're putting it in the right place injuries can happen.

Dr. Klinges also explained that the procedure is even more difficult where the patient is thin:

If the bifurcation [of the iliac vein] is a little bit lower this iliac vein can be very much in the midline. And if a patient is thin the distance between ... [the abdominal wall and the iliac vein] can be as little as one inch. And so if you have a rigid abdominal wall, and even if you lift up—and if the umbilicus is higher and you insert the Verres needle in the proper direction you still could hit or nick a branch of the iliac vein. So you can do everything right and still get a complication.

Following the testimony of the experts, plaintiff asked the court to omit the "exercise of judgment" portion of the medical malpractice jury charge, urging that there was "no question of a judgment call in this case" because the injury occurred outside of the operative area. The court denied plaintiff's request, but did modify the charge in two respects. First, the court added language to emphasize that "good faith exercise of judgment does not insulate a defendant from liability if he did not adhere to the standard of care." Second, the jury was permitted to decide whether the "exercise of judgment" rule was appropriate based on whether the "defendant had sustained the burden of proof" in establishing that "there were two courses of action and the doctor chose one." The final jury instruction read as follows:

If a physician has applied the required knowledge, skill and care in the diagnosis and the treatment of the patient he is not negligent simply because a bad result has occurred.

Likewise, where according to medical practice the manner in which the treatment is conducted is a matter subject to the judgment of the physician, the physician must be allowed to exercise that judgment. The physician cannot be held liable if in the exercise of judgment he has nevertheless made a mistake. Where judgment must be exercised the law does not require of the doctor infallible judgment. But I want you to understand that even a good faith exercise of judgment does not insulate a defendant from liability if he did not adhere to the standard of care that was required in the case. .... If, in fact, in the exercise of his judgment a doctor selects one of two courses of action, each of which in the circumstances has substantial support as proper practice by the medical profession, the doctor cannot be found negligent if the course chosen produces a poor result. But that burden of proof to show you that there were two courses of action is on the defendant.... I don't recall the evidence on that one way or the other. If there was evidence produced to show that there were two courses of action and the doctor chose one, then as far as I'm concerned the —— if you're satisfied the defendant has sustained the burden of proof on that, fine. But if the defendant hasn't, then there was only one course of conduct. And consequently if that's so, then the exercise of judgment that's called for in that clause does not apply.

On the other hand, a doctor who departs from standard medical practice where no judgment is permitted cannot excuse himself from the consequences by saying that

it was an exercise of his judgment. Or to state it in a different way, if the exercise of a doctor's judgment causes him to do that which standard medical practice forbids, the doctor would be negligent.

### III

A physician must act with that degree of care, knowledge, and skill ordinarily possessed and exercised in similar situations by the average member of the profession practicing in the field. *Walck v. Johns–Manville Prods. Corp.,* 56 *N.J.* 533, 560, 267 *A.*2d 508 (1970); *Germann v. Matriss,* 55 *N.J.* 193, 208, 260 *A.*2d 825 (1970); *Schueler v. Strelinger,* 43 *N.J.* 330, 344, 204 *A.*2d 577 (1964); *Safer v. Estate of Pack,* 291 *N.J.Super.* 619, 625, 677 *A.*2d 1188 (App.Div.), *certif. denied,* 146 *N.J.* 568, 683 *A.*2d 1163 (1996). Model Jury Charge 5.36A ("Model Charge"), which governs medical malpractice actions, articulates that governing standard of care: "A person who is engaged in the general practice of medicine represents that he/she or she [sic] will have and employ knowledge and skill normally possessed and used by the average physician practicing his/her profession as a general practitioner." *Model Jury Charge 5.36A (Civil),* 2 Medical Malpractice, Duty and Negligence (May 1997). That standard, recognizing that "medicine is not an exact science," holds physicians responsible for their negligence without making them guarantors of the health of their patients. *Schueler, supra,* 43 *N.J.* at 344, 204 *A.*2d 577.

In respect of medical specialists, the charge provides:

Specialists in a given field of medicine represent that they will have and employ not merely the knowledge and skill of a general practitioner, but that they have and will employ knowledge and skill normally possessed and used by the average specialist in the field. Thus, when a physician holds himself/herself out as a specialist and undertakes to diagnose and treat the medical needs of a patient, the law imposes a duty upon that physician to have and to use that degree of knowledge and skill which is normally possessed and used by the average specialist in that field, having regard to the state of scientific knowledge at the time that he/she or she [sic] attended the plaintiff.

[*Model Jury Charge 5.36A, supra,* at 2.]

In *Schueler,* the Court recognized that "good [medical] treatment will not necessarily prevent a poor result." 43 *N.J.* at 344,

204 *A*.2d 577. Accordingly, it held that a physician should not be held liable for "an honest mistake in diagnosis or in judgment as to the course of treatment taken." *Id.* at 344–45, 204 A.2d 577. The Court explained that "when a surgeon selects one of two courses ... either one of which has substantial support as proper practice by the medical profession, a claim of malpractice cannot be predicated solely on the course pursued." *Id.* at 346, 204 A.2d 577. That is because when "a matter [exists] about which there are differing schools of medical opinion[,] ... the plain inference is that the matter must be left to the good faith judgment of the experienced attending surgeon." *Ibid.*

Those observations were incorporated in another portion of the Model Charge, known as the "exercise of judgment" instruction, which explains the relation of a physician's use of judgment to the question of whether there has been a deviation from accepted medical practice:

> [W]here, according to accepted medical practice, the manner in which diagnosis and/or treatment is conducted is a matter subject to the judgment of the physician, the physician must be allowed to exercise that judgment. The physician cannot be held liable if in the exercise of judgment he/she or she [sic] has, nevertheless, made a mistake. Where judgment must be exercised, the law does not require of the doctor infallible judgment. [T]hus, a physician cannot be found negligent so long as he/she or she [sic] employs such judgment as is allowed by accepted medical practice. If, in fact, in the exercise of his/her judgment a doctor selects one of two or more courses of action, each of which in the circumstances has substantial support as proper practice by the medical profession, the doctor cannot be found negligent if the course chosen produces a poor result.
>
> [*Model Jury Charge 5.36A, supra*, at 5.]

Importantly, even where a physician is permitted to exercise medical judgment, the physician will be liable for malpractice if the exercise of such judgment "represent[s] a departure from the requirements of accepted medical practice." *Schueler, supra,* 43 *N.J.* at 345, 204 *A*.2d 577. Consequently, the Model Charge provides that doctors may not rely on the "exercise of medical judgment" excuse to avoid liability for ordinary negligence:

> [A] doctor who departs from standard medical practice where no judgment is permitted cannot excuse himself/herself from the consequences by saying that it

was an exercise of his/her judgment. Or, to state it in a different way, if the exercise of a doctor's judgment causes him/her to do that which standard medical practice forbids, the doctor would be negligent. Similarly, a doctor whose judgment causes him/her to omit doing something which is required by standard medical practice is also negligent.

[*Model Jury Charge 5.36A, supra,* at 5–6.] [1]

In the wake of *Schueler, supra,* which first described the relationship between medical judgment and the physician standard of care, our courts consistently have limited the application of the

---

[1] In *Morlino v. Medical Center,* 152 *N.J.* 563, 590, 706 A.2d 721 (1998), the Court directed the Supreme Court Committee on Model Jury Charges, Civil to amend the Model Charge in order to eliminate the phrase "the physician cannot be held liable if, in the exercise of his judgment, he nevertheless made a mistake" because of its potential to confuse the jury. The Court further instructed the Committee to determine whether fewer references to the term "judgment" are possible to adequately "communicate to the jury that medicine is not an exact science and that physicians and surgeons must exercise judgment[,]" and to "try to make the entire charge shorter and clearer." *Ibid.* In April 1999, the following revised charge was adopted:

The Law recognizes that the practice of medicine is not an exact science. Therefore, the practice of medicine according to accepted medical standards may not prevent a poor or unanticipated result. Therefore, whether the defendant doctor was negligent depends not on the outcome, but on whether he/she adhered to or departed from the applicable standard of practice and care.

A doctor may have to exercise judgment when diagnosing and treating a patient. However, alternative diagnosis/treatment choices must be in accordance with accepted standard medical practice. Therefore, your focus should be on whether standard medical practice allowed judgment to be exercised as to diagnosis and treatment alternatives and, if so, whether what the doctor actually did to diagnose or treat this patient was accepted as standard medical practice. If you determine that the standard of care for treatment or diagnosis with respect to (specify what type(s) treatment or diagnosis is involved) did not allow for the choices or judgments the defendant doctor made here, then the doctor would be negligent.

If you find that the defendant(s) has (have) complied with the accepted standard of medical care, then he/she is not liable to the plaintiff regardless of the result. On the other hand, if you find that the defendant(s) has (have) departed from the accepted medical standard, then you must determine whether such deviation or negligence was a proximate cause of any injury sustained or any loss incurred by plaintiff.

[*Model Jury Charge 5.36A (Civil),* 4–6 Medical Malpractice, Duty and Negligence (footnotes and citations omitted) (April 1999) (hereinafter "Revised Model Jury Charge 5.36A").]

"exercise of judgment" charge to medical malpractice actions concerning misdiagnosis or the selection of one of two or more generally accepted courses of treatment. *See Patton v. Amblo,* 314 *N.J.Super.* 1, 9, 713 *A.*2d 1051 (App.Div.1998)(holding that doctor was not entitled to "exercise of judgment" charge where alleged malpractice involved making scalpel incision too deep); *Crego v. Carp,* 295 *N.J.Super.* 565, 575–76, 685 *A.*2d 950 (App.Div.1996)(holding that "exercise of judgment" charge is appropriate where alleged malpractice arose from doctor's failure to timely diagnose ruptured Achilles tendon), *certif. denied,* 149 *N.J.* 34, 692 *A.*2d 48 (1997); *Hofstrom v. Share,* 295 *N.J.Super.* 186, 195, 684 *A.*2d 981 (App.Div.1996) (upholding trial court's instruction of "exercise of judgment" charge in misdiagnosis case), *certif. denied,* 148 *N.J.* 462, 690 *A.*2d 610 (1997); *Adams v. Cooper Hosp.,* 295 *N.J.Super.* 5, 8–9, 10–11, 684 *A.*2d 506 (App.Div.1996) (holding that court did not err by refusing to charge jury with "exercise of judgment" instruction where issue was whether nurse had duty to constantly monitor patient; because . case did not involve selection between one of two courses of treatment or two schools of thought, trial court properly omitted "exercise of judgment" portion of charge), *certif. denied,* 148 *N.J.* 463, 690 *A.*2d 610 (1997). Indeed, the Model Charge itself was facially limited to cases in which the physician exercised judgment in selecting among acceptable courses of action:

> If ... in the exercise of his/her judgment a doctor selects one of two or more courses of action, each of which in the circumstances has substantial support as a proper practice by the medical profession, the doctor cannot be found negligent if the course chosen produces a poor result.
>
> [*Model Jury Charge 5.36A, supra,* at 5.]

*Patton, supra,* like this case, involved the propriety of including the "exercise of judgment" charge where the alleged act of malpractice involved the performance of a laparoscopic tubal ligation procedure. The plaintiff's stomach was ruptured during the procedure. 314 *N.J.Super.* at 5, 713 *A.*2d 1051. The plaintiff's expert testified that the defendant had deviated from the medically accepted standard of care by making the initial incision too deep, such that the defendant did not feel any resistance when she

placed the Verres needle through the incision and into plaintiff's peritoneal cavity. *Id.* at 6, 713 A.2d 1051. In contrast, defendant's experts characterized the doctor's error in incising the skin as "a risk of the surgery," which did not constitute negligence. *Ibid.*

The defendant contended that she was entitled to the "exercise of judgment" charge because she "chose 'from among several accepted and recognized options in the method she employed at surgery,'" reasoning that she exercised judgment by deciding to convert to a different laparoscopic method after determining that the initial incision was too deep. *Id.* at 9, 713 A.2d 1051. The plaintiff argued that the trial judge inappropriately charged the jury with the "exercise of judgment" instruction because the deviation did not concern "defendant's choices during the procedure," but rather "the manner in which the procedure was performed." *Id.* at 8, 713 A.2d 1051.

The Appellate Division in *Patton* held that the court committed reversible error by charging the jury with the "exercise of judgment" portion without "separating out what aspects of the surgery involved judgment and what did not." *Id.* at 9–10, 713 A.2d 1051. The court determined that the "exercise of judgment" charge is appropriate only "where a surgeon selects one of two courses, 'either one of which has substantial support as proper practice by the medical profession.'" *Id.* at 8, 713 A.2d 1051 (quoting *Schueler, supra,* 43 *N.J.* at 346, 204 *A.*2d 577). In contrast, the alleged malpractice "dealt with the skill [with] which she performed the surgery." *Id.* at 9, 204 A.2d 577. Of particular relevance here, the *Patton* court specifically held that no judgment was exercised when incising the skin within the meaning of the "exercise of judgment" charge:

> Even if we accept defendant's admission that she made her initial incision too deep, it is clear that she did not employ any judgment when she was incising the skin. It was not her intention to pierce all three layers of skin. Regardless of the method in which she performed the incision, either by elevating the skin prior to the initial incision or by simply holding the skin taut, she simply cut too deep. She did not use her judgment to determine the depth. .... Her incision of the peritoneum was a mistake and cannot be considered an exercise of judgment.
>
> [*Ibid.*]

 In this case, as in *Patton,* the central issue concerns whether defendant failed to exercise reasonable professional care while performing the ligation procedure. Expert testimony focused exclusively on whether defendant was negligent. The Appellate Division, however, held that the "exercise of judgment" charge was properly invoked under these circumstances. The court reasoned that the insertion of the Verres needle into plaintiff's closed abdomen necessitated the exercise of medical judgment because the procedure is performed "blindly," requiring physicians to "use judgment, based on their perceptions, particularly the resistance or absence to resistance of the needle, to determine when the abdominal cavity has been reached." The court further observed that "[a] mistake in judgment is not tantamount to negligence. Negligence in this context is failure to adhere to a proscribed method, protocol or procedure for inserting Verres needles."

The appellate court majority misinterpreted the standard governing the application of the rule recognizing the exercise of medical judgment. The application of the "exercise of judgment" charge can excuse a physician for "mistakes." The rule provides that "[t]he physician cannot be held liable if in the exercise of judgment he/she or she [sic] has, nevertheless, made a mistake." *Model Jury Charge 5.36A, supra,* at 5. In *Morlino, supra,* 152 *N.J.* at 588, 706 *A.*2d 721, we recently observed, however, that that "sentence in the Model Charge is problematic." We explained that

[t]he purpose of the sentence is to advise the jury that, as between two or more courses of action, each of which accords with accepted medical practice, a doctor will not be found negligent if the course of action he or she chooses turns out to be unsuccessful. Taken out of context, the sentence could be understood to mean that a doctor who deviates from the relevant standard of care is not liable if the mistake was the result of the exercise of medical judgment. The danger is that the sentence could be construed to mean that an honest, but mistaken, exercise of judgment insulates the physician from liability for a mistake that violates a relevant standard of care. A mistake, however, connotes an instance in which the physician violates such a standard of care. Consequently, a physician who fails to abide by an objective standard of care is subject to liability even if the failure results from the exercise of judgment.

632

[*Id.* at 589, 706 A.2d 721.]

■ If the exercise of judgment rule is inappropriately or erroneously applied in a case that involves only the exercise of reasonable care, the aspect of the rule that excuses a physician for "mistakes" would enable the physician to avoid responsibility for ordinary negligence. The "mistake" that inheres in negligence, that is, the failure to exercise reasonable care, is not the kind of mistake that is excusable. If, therefore, the physician's professional conduct implicates only the exercise of reasonable care in the performance of a medical procedure and not the exercise of medical judgment in selecting among acceptable and medically reasonable courses of treatment, the medical judgment rule should not be invoked. The doctor's conduct in performing the procedure must be evaluated according to the applicable professional standard of care that is required of a medical practitioner in the same field. *E.g., Morlino, supra,* 152 *N.J.* at 589, 706 *A.*2d 721. In that context, it is error to instruct a jury to determine whether the defendant "exercised judgment" and may not be responsible for mistakes.

This case does not involve a physician's choice between alternative courses of medical treatment. No testimony was presented suggesting that defendant should have performed the tubal ligation using a different procedure or that the result suffered by plaintiff was a "mistake" attributable to the selection of one medical procedure rather than another. The experts disagreed only on whether defendant performed the selected procedure in a negligent manner. This testimony does not support the "exercise of judgment" charge. *E.g. Adams, supra,* 295 *N.J.Super.* at 11, 684 *A.*2d 506 (holding that where expert focused on proper standard of care governing defendant's conduct, as opposed to exercise of judgment between two accepted schools of thought, "exercise of judgment" charge was inapplicable). The characterization of the procedure as a "blind" one does not imply that acceptable alternative courses of the medical treatment were available. Rather, it is a factor that should be considered in determining whether the skill exhibited by defendant in effectuat-

ing the procedure was reasonable and in accordance with the professional standard of care applicable to similarly qualified physicians. To the extent that "judgment" was implicated, it was descriptive only of defendant's skill in performing the laparoscopic procedure. In these circumstances, because the term "judgment" has a special meaning as part of the "medical judgment" rule, its use should be avoided in a medical malpractice case involving only negligence or the failure to exercise reasonable care in the rendering of medical treatment or the performance of medical procedures.

We note that the revised Model Charge correctly conveys the precise use of the term "judgment" in connection with the practice of medicine:

> If a case does not involve a legitimate judgment call or two schools of thought, then the Trial Judge should omit [the "exercise of judgment"] portion of the charge. If a case involves judgment issues on some theories of liability, but not on others, the charge should be tailored to those facts. Medical malpractice practitioners should assist the court in framing tailored, objective statements of those issues which do involve legitimate dispute issues of judgment or two schools of thought. To give one example among many, if a distinct issue in a case involved a doctor who ordered a test and never received the result, the jury would appropriately be charged that there was no exercise of judgment or two schools of thought defense to that claim. In contrast, what steps to take in response to a test result might involve one or more issues of judgment.
>
> [*Revised Model Jury Charge 5.36A, supra,* at 5 n. 4 (citations omitted).]

Finally, we are in accord with the conclusion reached by the Appellate Division that the issue of negligence presented triable issues of fact. Defendant's expert testified plaintiff's injuries could have occurred even in the absence of negligence, and added that on the facts, particularly in light of patient's thin anatomy, defendant conformed to the standard of care. That evidence, if credited by the jury, could support the determination that defendant was not negligent.

### IV

For the foregoing reasons, the judgment of the Appellate Division is reversed. The matter is remanded for a new trial in accordance with this opinion.

634

*For Reversal and Remandment*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Oposed*—None.